ELSIE E. HATFIELD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 43332. Promulgated July 13, 1931.

*G. M. Sherman, Esq.*, for the petitioner.
*Eugene Harpole, Esq.*, for the respondent.

OPINION.

TRAMMELL: This proceeding is for the redetermination of a deficiency in income tax of $2,114.29 for 1925. The only matter put in controversy by the petition is whether a purchase-money note received by the petitioner in connection with the sale of certain real estate and secured by a mortgage on such property had a fair market value at the time of its receipt in 1925.

In 1925 the petitioner sold to the Sanford Bond and Mortgage Company of Sanford, Fla., certain real estate known as the "Hatfield grove" situated in Orange County, Florida, and which had cost her $35,000. The sale price was $90,000, of which $60,000 was represented by a negotiable promissory note of the purchaser dated September 1, 1925, payable "On or before fifteen years after date" and bearing interest at 7 per cent per annum, payable annually. The note was secured by a mortgage on the property. The expense of the sale was $9,648.

The Sanford Bond and Mortgage Company was organized in the early part of 1924 and began business in November of that year. That company engaged in the business of making various kinds of loans, accepting notes secured by chattel mortgages and real estate mortgages as well as those having personal security. It was also engaged in building houses and selling them. The company was solvent in 1925, but began to have financial difficulties in subsequent years and by the latter part of 1928 its financial condition was bad. In 1928 this company was consolidated with the Southeastern Se-

curities Corporation, to whom it transferred all of its assets includ ing the "Hatfield grove." The Southeastern Securities Corporation assumed the mortgage given to the petitioner on that property. At some undisclosed date, but prior to December 4, 1930, the Southeastern Securities Corporation returned to the Sanford Bond and Mortgage Company all of the assets received from it. The evidence indicates that the petitioner, having found a purchaser for the "Hatfield grove" at a price less than the amount of the mortgage note held by her and the interest thereon, took back the property with the consent of the company. About December 4, 1930, the remaining assets were sold for about $7,000 by the sheriff at public sale. This amount was insufficient to satisfy the judgment under which the property was sold.

In her income-tax return for 1925 the petitioner reported the sale of real estate for $90,000. She reported having received $30,000 in cash and deferred payments of $60,000, which were shown as having "no cash value." She showed the "unrealized profit" from the transaction as $45,352, but included in her income no profit from the sale.

In determining the deficiency here involved the respondent determined that the note secured by the mortgage on the property had a fair market value of $35,000. He accordingly computed the profit from the sale at $20,352 and increased the petitioner's taxable income by that amount.

While counsel for the petitioner in his brief raises some question as to amount of the first payment, reported as cash, no issue on this point is raised by the pleadings and no testimony was introduced with respect thereto.

On the question of whether the note had a fair market value, three witnesses testified. The testimony of two of them is not shown to have been in connection with the particular notes involved. They were asked, apparently, if any note given by any corporation or individual for $60,000 had a market value if secured by certain property not shown to have been the same or similar to that on which the mortgage herein was given. Another witness, president of the corporation which gave the note, testified that the corporation was solvent in 1925 and that, in his opinion, the note and mortgage were worth their face value when given. His testimony in some respects is also somewhat inconsistent with this testimony and in conflict with the above statements. He also testified that his company could not have sold the note and mortgage because its customers did not deal in this class of security. We do not think that the testimony is sufficient to overcome the presumption of correctness attaching to the Commissioner's determination. The testimony

of the two witnesses as to market value, whose testimony is referred to above, is too general and leads us to the conclusion that the witness did not use the term market value in its generally and legally accepted meaning. If this testimony were accepted at its face value, it is broad enough to mean that, in the witness's opinion, the note of any corporation or individual, however high in financial standing and reputation, would not have had a market value. We can not accept such an opinion as establishing such a fact. The opinion of the president of the corporation is such that it tends rather to support a market value than to show that there was none for the note.

The Commissioner determined that the note had a market value of $35,000 instead of $60,000, the face of the note, and, considering all the testimony, we do not think that it is sufficient to show that the note did not have a market value to the extent determined by the Commissioner.

*Judgment will be entered under Rule 50.*